UNITED STATES of America,
Plaintiff–Appellee,

v.

**Dennis Ray PADEN, William M.
Headrick II, and Robert Boyd,**
Defendants–Appellants.

No. 89–4589
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Aug. 3, 1990.

Rehearing and Rehearing En Banc
Denied Sept. 6, 1990.

Dennis Ray Paden, Bastrop, Tex., pro se.

M.E. McLeod, Jackson, Miss. (Court-appointed), for Robert Boyd.

Gary D. Thrash, Jackson, Miss., for William M. Headrick, II.

Julie Epps, Rienzi, Miss. (Court-appointed), for Dennis Ray Paden.

Joe M. Hollomon, Asst. U.S. Atty., George Phillips, U.S. Atty., Jackson, Miss., for U.S.

Before JOHNSON, HIGGINBOTHAM and BARKSDALE, Circuit Judges.

JOHNSON, Circuit Judge:

Appellants Dennis Ray Paden (Paden), William M. Headrick, II (Headrick), and Robert Boyd (Boyd) entered guilty pleas on several federal criminal charges arising from the arson of Lakeland Stationers in Rankin County, Mississippi. All of the Appellants have appealed their sentences. Unable to find that the district court committed reversible error, this Court affirms the sentences imposed on the Appellants.

## I. FACTS AND PROCEDURAL HISTORY

In 1988, William M. Headrick, II, owned and operated a printing and retail business known as Lakeland Stationers, located in Rankin County, Mississippi. The business was not a successful venture, and Headrick became increasingly unable to satisfy the business's creditors. Headrick, desperate to stimulate cash flow, concocted a scheme to destroy a piece of duplicating equipment in order to collect the insurance proceeds. In a telephone conversation with his cousin, Dennis Ray Paden, Headrick confided his plan to defraud Lakeland Stationers' insurance company.[1]

Paden, a licensed electrician, apparently agreed to assist Headrick in completing this plan, informing Headrick that he could destroy the equipment in a controlled electrical fire that would appear accidental. On April 1, 1988, Paden traveled from his home in Pinehurst, Texas, to Mississippi, accompanied by two young associates, one of whom was the Appellant Robert Boyd. That evening, Headrick and his wife and Paden and the two associates discussed the relative merits of Headrick's scheme to defraud the insurance company. At some point, either Headrick or Paden concluded that the conspirators would burn the entire building which housed Lakeland Stationers, to claim the maximum insurance proceeds.[2]

The next afternoon, Headrick, Paden, Boyd and the other associate toured the inside of the Lakeland Stationers' building and formulated a plan for completing the

---

1. The Government contended that Headrick and Paden actually discussed the arson of Lakeland Stationers in this phone conversation. The actual contents of the phone conversation are not particularly essential to the question of whether the district court erred in assessing the Appellants' sentences.

2. On appeal, both Headrick and Paden individually claim that they believed only the duplicating machines would be destroyed. Each implicitly blames the other for the decision to burn the entire building.

arson. Satisfied with their planning, the parties removed some completed printing work from the building and retired to a nearby restaurant for dinner. That evening, April 2, 1988, Paden, Boyd and the other associate returned to the building to set it ablaze.

Entering the building with a key obtained from Headrick, Paden instructed his associates to remove a Tandy computer and printer from the building and place them in his automobile. Paden then poured a flammable printing chemical over rags inside the building. After the two associates distributed trash around the building, Paden ignited the rags. The three then left the burning building and returned to the Headricks' residence. In the meantime, the fire became an inferno, and spread to another building. The local fire department was called to the scene; in the course of fighting the blaze, fireman Tony Tadlock was trapped by falling debris and killed.

Subsequently, Paden and his associates returned to Texas, along with the computer and printer taken from Lakeland Stationers. The police later recovered these items after a search warrant was executed on Paden's residence in August, 1988. Based in part on this and other evidence accumulated after the fire, Headrick, Paden and Boyd were indicted on September 8, 1988, for their involvement in the arson. All three eventually entered pleas of guilty.

At the sentencing hearing, the district court determined that the base offense level for each of the Appellants was Level 43, pursuant to Sentencing Guideline 2A1.1 [First Degree Murder]. The court adjusted this base offense level downward to Level 33 for second degree murder, because the death of the firefighter was not caused "intentionally or knowingly." The court then assessed a two level increase on the sentences of Paden and Headrick for their roles as leaders in the criminal activity. The court imposed an additional two level increase on Paden based on the court's conclusion that Paden had willfully obstructed the administration of justice. Because of the obstruction of justice, the court denied Paden a sentence reduction

for acceptance of responsibility. While Headrick received no sentence enhancement other than the increase for his leadership role, the court denied Headrick a sentence reduction for cooperation with the Government.

The district court sentenced Headrick to 140 months in the custody of the Bureau of Prisons and to a term of five years on supervised release. Headrick was also ordered to make restitution in the sum of $14,750.00 to several individuals and entities injured by the Lakeland Stationers blaze. The court sentenced Paden to 210 months in the custody of the Bureau of Prisons and to a term of five years on supervised release. Paden likewise was ordered to make restitution in the sum of $14,750.00. Boyd, pursuant to a motion of the Government, received a sentence of only 15 months in the custody of the Bureau of Prisons and a term of three years on supervised release. Boyd was ordered to make $3,500.00 in restitution.

Each of the Appellants raise substantially different issues in their appeals. These issues will all be examined in turn.

## II. DISCUSSION

### A. William M. Headrick, II
#### 1. *Leadership Role*

Headrick argues that the district court improperly assessed a two level increase in his sentence for a leadership role in the criminal offense. Under section 3B1.1 of the Sentencing Guidelines, an offender plays an aggravating role in an offense if the offender "was an organizer, leader, manager or supervisor." According to Headrick, the Government failed to demonstrate sufficient evidence of a leadership role that would support sentence enhancement under section 3B1.1.

The standard of review of the Sentencing Guidelines is well-established. This Court "will affirm sentences imposed by district judges who make factual findings that are not clearly erroneous, and who apply the guidelines to those findings." *United States v. Mejia–Orosco,* 867 F.2d 216, 221

(5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989).

In the present case, the district court's determination that Headrick occupied a leadership role is not clearly erroneous. Application Note 3 to section 3B1.1 outlines several factors a court may consider in determining whether a criminal defendant occupies a leadership role: the exercise of decision making authority, the recruitment of accomplices, the degree of participation in planning or organizing the offense, the degree of control and authority exercised over others, etc. Here, there is sufficient evidence to indicate that Headrick set in motion the chain of events that culminated in the deadly Lakeland Stationers fire. Headrick recruited the individuals who actually started the blaze. Headrick led these individuals to the Lakeland Stationers building for a preliminary inspection and provided them a key to the building for their entrance on the evening of the fire.

■ Headrick apparently contends that because Paden's sentence was enhanced by Paden's leadership role in the offense, the court should not have enhanced Headrick's sentence for the same reason. However, Application Note 3 to section 3B1.1 provides that more than one person can qualify as a leader or organizer of a criminal offense. In this case, the court found that both Headrick and Paden occupied such a leadership role. This Court can find no error in the district court's determination.

### 2. *Cooperation with the Government*

■ Headrick also argues that the district court erred in refusing to grant a downward departure from his offense level based upon his alleged substantial assistance to the Government. Whether or not a criminal defendant has provided substantial assistance to the Government is a factual question. The district court's determination of this factual question, like its findings with respect to the leadership role of the defendant, *Mejia–Orosco,* 867 F.2d at 221, are subject to the "clearly erroneous" standard of review. This Court will uphold a district judge's refusal to depart from the guidelines unless the refusal is in violation of law or is clearly erroneous. *United States v. Thomas,* 870 F.2d 174, 176 (5th Cir.1989).

■ Under the Sentencing Guidelines, a district court properly may reduce a criminal defendant's sentence on the basis of substantial assistance in the investigation or prosecution of another person. *See United States v. White,* 869 F.2d 822, 828–29 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3172, 104 L.Ed.2d 1033 (1989). In order to evaluate the propriety of such a reduction, the district court must be able to evaluate the extent of the defendant's assistance. Ordinarily, the government will file a motion that recites the assistance provided. The absence of a government motion, though, "does not preclude a district court from entertaining a defendant's showing that the government is refusing to recognize such substantial assistance." *Id.* at 829.

In this case, however, the district court had absolutely no evidence on which it could evaluate the extent of Headrick's assistance to the Government. The Government did not file a motion that recited any assistance provided by Headrick. Headrick filed a Motion to Depart from the Sentencing Guidelines, but the motion stated only that Headrick had been of substantial assistance to the Government—the motion did not specifically recount the extent of Headrick's assistance. Moreover, Headrick's testimony at his sentencing hearing did not detail the extent or nature of Headrick's assistance. In short, the district court had no evidence from which it could determine that Headrick's assistance was *substantial.* Accordingly, this Court cannot conclude that the district court's refusal to depart from the Sentencing Guidelines was clearly erroneous.

### B. Dennis Ray Paden

### 1. *Admissibility of Statements Made During Plea Bargaining*

■ Paden argues that the district court erred in concluding that statements made by Paden during the course of plea bargaining were admissible in the sentencing phase of his trial. Paden cites Fed.R.

Crim.P. 11(e)(6)(D), which is based upon (and virtually identical to) Fed.R.Evid. 410(4). Rule 11(e)(6)(D) provides that "any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn" is not admissible against the criminal defendant who made the statement.

The incriminating statements in question were made during plea negotiations in August 1988. According to Paden, the Government unilaterally ended these negotiations, and consequently cut off the Government's opportunity to use any statements Paden made during the negotiations. Paden maintains that his subsequent plea agreement with the Government in April 1989 did not resurrect the Government's opportunity to use the incriminating statements.

This Court disagrees. We find nothing in either Fed.R.Crim.P. 11(e)(6)(D) or Fed. R.Evid. 410(4) requiring that a particular discussion or series of discussions must produce a plea agreement. Neither do we find anything in these rules that prevents either side from discontinuing negotiations for a time. Progress toward a plea is rarely smooth and unbroken. Both rules look only to the end result of the process. Here, the end result of Paden's discussions with the Government was a guilty plea. By their express language, Fed.R.Crim.P. 11(e)(6)(D) and Fed.R.Evid. 410(4) do not prohibit statements made during plea negotiations that lead to a plea of guilty.[3]

█ At sentencing, the district court may rely upon any evidence of the defendant's credibility and responsibility that is "sufficiently reliable." *United States v. Flores*, 875 F.2d 1110, 1112 (5th Cir.1989). In this case, the statements are sufficiently reliable, because they came directly from Paden. Once it was shown that the statements were sufficiently reliable, Paden had

"the burden of showing that this information upon which the district court relied in sentencing was materially untrue." *Flores*, 875 F.2d at 1113. Paden has not satisfied this burden. He insists that the statements he made during the plea negotiations were coerced by threats from the Government prosecutors, but he has not denied on appeal that the statements he made were accurate. Even if Paden may be said to have denied the truth of his incriminating statements, he has not alleged a colorable claim that his statements were involuntary. He claims that Government prosecutors pressured him to "tell the truth," and suggested that Paden might receive the death penalty or life imprisonment if he did not admit that he was the one who lit the match that sparked the Lakeland Stationers fire. Encouraging a defendant to tell the truth, however, does not render a statement involuntary. *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir.1978). Neither does a recitation of the potential sentence a defendant might receive render a statement involuntary. *Id.* at 1062–63.

In this case, the district court, based on all the available evidence, reached a decision that Paden's prior incriminating statements during plea negotiations were relevant and helpful to a determination of the sentence Paden would receive. This Court cannot conclude that the district court's decision was in error.

### 2. Leadership Role

█ Paden also argues that the district court erred in awarding a two-point increase in Paden's base offense level for an alleged leadership role in the criminal offense. As previously noted, the standard of review of the district court's application of the Sentencing Guidelines is whether the court's factual findings are clearly erroneous. *Mejia–Orosco*, 867 F.2d at 221.

---

**3.** It should be noted that the Federal Rules of Evidence expressly do not apply during sentencing. Fed.R.Evid. 1101(d)(3). Thus, Fed.R.Evid. 410(4) is clearly inapplicable to this case. For this reason, Paden's reliance on *United States v. Ross*, 493 F.2d 771 (5th Cir.1974), is misplaced.

In *Ross*, the prosecutor attempted to introduce *at trial* incriminating statements of the defendant made during plea negotiations. *Ross* does not limit the admissibility of such statements during sentencing hearings.

In the present case, evidence available to the district court suggests that Paden made the decision to bring the two young associates to Mississippi to participate in the arson. Paden, along with Headrick, extensively planned the arson. Further, Paden himself started the fire. Because the evidence sufficiently establishes Paden's leadership role in the offense, this Court will not disturb the district court's findings.

### 3. *Obstruction of Justice*

██ Paden additionally contends that the district court erred in awarding a two level increase in Paden's base offense level because he allegedly obstructed justice. Again, the district court's determination is subject to the "clearly erroneous" standard of review. *Mejia–Orosco*, 867 F.2d at 221.

The district court found that Paden had obstructed justice in two instances. First, the court concluded that Paden had willfully failed to disclose material information regarding his prior criminal history. The record supports this conclusion: at one point, Paden concedes that he withheld a portion of his criminal history. Second, the court concluded that Paden had given inconsistent and unbelievable testimony under oath concerning his involvement in starting the Lakeland Stationers fire. Indeed, at the sentencing hearing, Paden's counsel acknowledged the existence of this contradictory testimony. Based upon our review of the record, this Court cannot conclude that the district court's enhancement of Paden's sentence was clearly erroneous.

### 4. *Acceptance of Responsibility*

██ Paden maintains that the district court erred in concluding that he was not entitled to a decrease of two points in his offense level for acceptance of responsibility. The determination of whether a defendant has accepted responsibility for his crime "enjoys the protection of the 'clearly erroneous' standard." *Thomas*, 870 F.2d at 176.

There was extensive argument at Paden's sentencing hearing on the question of whether Paden was entitled to a sentence reduction for acceptance of responsibility. The court ultimately concluded that, as a matter of law, Paden was not entitled to a reduction because of his earlier obstruction of justice. Nonetheless, the court permitted Paden to explain why he should be entitled to a reduction on the basis of acceptance of responsibility. Paden explained that he was entitled to reduction because he had "come before the Court and acknowledged his guilt for a very serious crime."

Paden claims that the district court improperly determined that it could not both enhance a sentence for obstruction of justice and reduce a sentence for acceptance of responsibility. However, at the time of Paden's sentencing hearing in July 1989, Application Note 4 of section 3E1.1 provided that an "adjustment under this section is not warranted where a defendant perjures himself, suborns perjury, or otherwise obstructs the trial or the administration of justice ... regardless of other factors." Under this language, a court could not reduce a sentence for acceptance of responsibility if the defendant's sentence were enhanced for obstruction of justice. Eventually, the United States Sentencing Commission amended Application Note 4 to permit adjustments for both obstruction of justice and acceptance of responsibility, but this amendment only became effective on November 1, 1989—several months after Paden's sentencing hearing. *Cf. United States v. Irabor*, 894 F.2d 554, 557 n. 1 (2d Cir.1990) (refusing to apply the amended Application Note 4 to a sentencing hearing that occurred prior to the effective date of the amendment).

██ Even if the amended Application Note 4 had been effective on the date of Paden's sentencing, it is unlikely that Paden would have benefitted from its language. The new Application Note 4 suggests that adjustments for both obstruction of justice and acceptance of responsibility are permissible in "extraordinary cases." This case, however, does not present extraordinary circumstances. Paden informed the district court that he had ac-

cepted responsibility by acknowledging his guilt in a serious case. Nonetheless, a guilty plea does not entitle a defendant to sentence reduction as a matter of right. Sentencing Guideline § 3E1.1(c). While a guilty plea may provide some evidence of acceptance of responsibility, it does not of itself warrant a reduced sentence. Application Note 3 to Sentencing Guideline § 3E1.1. Accordingly, this Court is unable to find that the district court's decision that Paden was not entitled to sentence reduction is clearly erroneous.

### 5. *Restitution*

■ Paden argues that the district court erroneously awarded restitution to individuals or entities that were not named in the presentence report. However, by his own admission, Paden raised no objection at the sentencing hearing to the ordered restitution to the general creditors. Accordingly, Paden has failed to preserve error and cannot now complain on appeal.

■ Paden maintains that the award of restitution should be vacated, even in the absence of objection, because the award constitutes "plain error." This Court has defined "plain error" as an error "so obvious that failure to notice it would 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Musquiz*, 445 F.2d 963, 966 (5th Cir.1971) (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). Any error committed by the district court in this case does not rise to the level of plain error. The presentence report referred to several unnamed general creditors who had accounts receivable from Lakeland Stationers. It can reasonably be assumed, at least in the absence of objection from Paden, that the restitution order includes these creditors who were not specifically named in the presentence report.

■ Paden also contends that *United States v. Taylor*, 868 F.2d 125 (5th Cir. 1989), stands for the proposition that no objection to the restitution order was necessary. *Taylor* concluded merely that the appellate courts might overlook a defendant's failure to object to a sentencing guideline error, at least until the courts and counsel became more familiar with these new and complex requirements. Restitution, however, does not raise the same procedural difficulties as application of the levels of the sentencing guidelines. To preserve error, a defendant must object to any error in a restitution order.

■ In addition to his other complaint, Paden argues that the district court's restitution order should be reversed in its entirety because its ruling that Paden was capable of making restitution is unsupported by the record. The standard of review on appeal is whether the district court abused its discretion in directing the restitution as ordered. *United States v. Ryan*, 874 F.2d 1052, 1054 (5th Cir.1989). "District courts are accorded broad discretion in ordering restitution." *Id.*

■ The record reflects that the district court carefully examined Paden's ability to pay restitution. The presentence report concluded that Paden's present earning ability as an electrician was approximately $500.00 per week. Based upon this and other evidence, the district court found that Paden had a viable trade and good employment prospects. Even then, the court required that Paden pay in restitution only a fraction ($14,750.00) of the total losses of $766,959.00 resulting from the Lakeland Stationers fire. Apportioned over a long period, Paden is only required to make restitution payments in the sum of $250.00 per week, well within Paden's earning potential. Therefore, this Court is unable to find that the district court abused its discretion in its restitution order.

### C. Robert Boyd

#### 1. *Base Offense Level*

■ Boyd argues that the district court erred in determining his base offense level. The standard of review for application of the sentencing guidelines is whether the trial court's findings are clearly erroneous. *United States v. Mejia–Orosco*, 867 F.2d at 221.

■ Boyd entered a guilty plea and was sentenced for a violation of 18 U.S.C. § 1952(a)(3)—Interstate or Foreign Travel or Transportation in Aid of Racketeering Enterprise. The Sentencing Guideline for this offense is section 2E1.2(a), which provides that the base offense level is the greater of the following:

(1) 6; or

(2) the offense level applicable to the underlying crime of violence or other unlawful activity in respect to which the travel or transportation was undertaken.

Application Note 2 to section 2E1.2(a) states that if the underlying conduct violates state law, the court should use the offense level that corresponds to the most analogous federal offense. In this case, the underlying state offense was arson.

The applicable guideline for a federal arson offense is section 2K1.4, which ordinarily provides for a base offense level of 6. However, the guideline specifically states that if the defendant's arson caused death, the district court must apply the "most analogous guideline from Chapter Two, Part A (Offenses Against the Person), if the resulting offense level is greater than that determined above." Sentencing Guideline § 2K1.4(c)(1). Under this requirement, the district court determined that the most analogous guideline in Chapter Two was section 2A1.2 (Second Degree Murder). The base offense level under section 2A1.2 is 33, which the district court applied to Boyd because the offense level is greater than six. On motion of the Government, the district court then reduced Boyd's base offense level to 15, pursuant to Sentencing Guideline section 5K1.-1. Since the district court's sentence applies the literal language of the guidelines, this Court cannot conclude that the district court's sentence is clearly erroneous.

### 2. *Restitution*

■ Boyd also alleges that the district court erred in ordering him to make restitution. Boyd claims that his actions caused no loss, so therefore the restitution is impermissibly in excess of the crime of conviction. However, the record establishes that the total losses resulting from the arson in which Boyd participated were $766,959.00. Of this amount of loss, the district court ordered that Boyd pay only $3,500.00, at the rate of $100.00 per month. This Court is unable to conclude that the district court abused its discretion in ordering restitution in this amount.

### III. CONCLUSION

The sentences received by the Appellants William M. Headrick, II, Dennis Ray Paden, and Robert Boyd are affirmed in all respects.

AFFIRMED.